Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ROWLEY LAW PLLC**
Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Email: srowley@rowleylawpllc.com
        drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATHAN SMITH, derivatively on behalf of APPLOVIN CORP., <br><br> Plaintiffs, <br><br> v. <br><br> ADAM FOROUGHI, MATTHEW STUMPF, CRAIG BILLINGS, HERALD CHEN, MARGARET GEORGIADIS, ALYSSA HARVEY DAWSON, BARBARA MESSING, TODD MORGENFELD, EDWARD OBERWAGER, and EDUARDO VIVAS, <br><br> Defendants, <br><br> -and- <br><br> APPLOVIN CORP., a Delaware Corporation, | Case No.  5:25-cv-4261 <br><br> **JURY TRIAL DEMANDED** <br><br> **CLASS ACTION** <br><br> **PLAINTIFF'S DERIVATIVE COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:** <br><br> (1) **Breach of Fiduciary Duty (Derivatively Against the Director Defendants)** <br> (2) **Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)** <br> (3) **Violation of Section 14(a) of** |

PLAINTIFF'S CLASS ACTION COMPLAINT

113936v1

| Nominal Defendant. | the Exchange Act (Against the Director Defendants) |

Plaintiff Nathan Smith ("Plaintiff"), derivatively on behalf of AppLovin Corp. ("AppLovin" or "AppLovin Corp." or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Wayne County Employees' Retirement System, Individually and On Behalf of All Others Similarly Situated v. AppLovin Corporation et al*. (N. Dist. Cal. San Jose Div. Case 5:25-cv-03438) (the "Securities Action"); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff, a stockholder of AppLovin Corp., on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least May 10, 2023, to March 26, 2025 ("Relevant Period"). During that time the Defendants (as defined herein) caused or allowed AppLovin Corp. to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.    AppLovin is a Palo Alto, California-based technology company that helps developers to market, monetize, analyze, and publish their mobile apps through the Company's digital advertising, marketing, and analytics platforms.

AppLovin relies on third-party platforms like the Apple App Store and Google Play Store to distribute its developers' apps, collect payments made on in-app purchases, and target users with relevant advertising. In mid-2020, Google, Apple, and Meta Platforms initiated a multi-year global effort to restrict third-party tracking activity and limit advertisers' ability to collect app and user data across platforms and devices. As a significant driver of AppLovin's revenue, these third-party platforms have considerable market power and discretion to set platform fees, select which apps to promote, and decide how much consumer information to provide to advertising networks.

3.     Throughout the Relevant Period, AppLovin assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations." AppLovin also attributed its use of artificial intelligence ("AI") as a key driver of revenue growth and a strategic differentiator in its advertising business.

4.     Defendants misled investors by, throughout the Relevant Period: (1) failing to disclose that AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosing risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; (3) falsely attributing AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games; and (4) as a result of the foregoing, making public statements about the Company's

business, operations, and prospects that were materially false and misleading.

5.      On February 26, 2025, investors began to learn the truth about AppLovin's fraudulent business practices when Culper Research and Fuzzy Panda Research published reports (the "Culper Report" and "Panda Report") alleging several issues with AppLovin's practices. The Culper Report alleged that AppLovin exploits app permissions to force-feed silent, backdoor app installations onto users' phones, often through inadvertent clicks due to poor user experience design. The Culper Report also stated that AppLovin's e-commerce program is a "smoke and mirrors game" that steals attribution for advertising from Meta to bolster its results. The Panda Report accused AppLovin of reverse-engineering Meta Platforms' advertising data to target users and commit advertising fraud. The report highlighted "impossibly high CTRs (click-through rates)" of 30 percent to 40 percent, which are ten times the industry norms, attributing this to manipulative practices such as ads clicking on themselves or using design gimmicks to trigger forced shadow downloads. The Panda Report also alleged that AppLovin illegally tracks children's data and serves sex ads to minors.

6.      After the Culper Report and Panda Report were published, AppLovin's stock price fell by 12.2 percent, dropping from $377.06 to $331.00 per share on February 26, 2025.

7.      Then, on March 26, 2025, Muddy Waters Research published a report (the "Muddy Waters Report") concluding that AppLovin systematically used proprietary third-party data in ways that violated the terms of service of Facebook, Google, Snap, Reddit, as well as other platforms, potentially leading to backlash and service blocking and threatening the sustainability of AppLovin's revenue growth.

8.      On this news, AppLovin's stock price plummeted 20.1 percent, dropping from $327.62 to $261.70 per share on March 27, 2025.

9.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

**PARTIES**

**A.     Plaintiff**

10.     Plaintiff is a current shareholder of AppLovin Corp. and has continuously held AppLovin Corp. stock during all times relevant hereto and is committed to retaining AppLovin Corp. shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of AppLovin Corp. and its shareholders in enforcing its rights.

**B.     Nominal Defendant**

11.     Nominal Defendant AppLovin Corp. is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1100 Page Mill Road, Palo Alto, California 94304. AppLovin Corp. common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "APP."

**C.     Individual Defendants**

12.     Defendant Adam Foroughi co-founded the Company and has served as CEO and a director since 2011.  He has also been Chairman of the Company's Board since March 2021

13.     Defendant Matthew Stumpf is the Company's CFO since January 2024 and was previously the Company's Vice President of Finance and FP&A.

14.     Defendant Craig Billings has been a director of the Company since December 2020 and is a member of the Audit Committee.

15.     Defendant Herald Chen has been a director of the Company since August 2018 and is an Advisor to the CEO since 2024.

16.     Defendant Margaret Georgiadis has been a director of the Company

since January 2021 and is a member of the Company's Audit Committee.

17.    Defendant Alyssa Harvey Dawson has been a director of the Company since November 2021 and is a Member of the Company's Audit Committee.

18.    Defendant Barbara Messing has been a director of the Company since March 202.

19.    Defendant Todd Morgenfeld has been a director of the Company since September 2023 and is the Chair of the Company's Audit Committee.

20.    Defendant Edward Oberwager has been a director of the Company since November 2019.

21.    Defendant Eduardo Vivas has been a director of the Company since August 2018.

22.    Defendants Foroughi Billings, Chen, Georgiadis, Dawson, Messing, Morgenfeld, Oberwager, and Vivas are herein referred to as "Director Defendants."

23.    Defendants Foroughi and Stumpf are herein referred to as "Officer Defendants."

24.    Defendants Billings, Georgiadis, Dawson, and Morgenfeld are herein referred to as the "Audit Member Defendants."

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

26.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.    Venue is proper in this court under 28 U.S.C. § 1391 because a significant amount of the conduct at issue took place and had an effect in this District.

**DIVISIONAL ASSIGNMENT**

29.    This Division is proper pursuant to Northern Dist. L.R. 3-5(b) as AppLovin, Corp. is headquartered in Palo Alto, California (County of Santa Clara) and a significant amount of the conduct at issue took place and had an effect in Palo Alto (County of Santa Clara).

**FURTHER SUBSTANTIVE ALLEGATIONS**

**A.    Company Background**

30.    AppLovin is a mobile gaming and advertising technology company. The Company's major customers include a diverse range of advertisers, independent developer studios, large global internet platforms like Google and Facebook, and other companies involved in mobile gaming and ecommerce markets. AppLovin has faced several challenges and made strategic adjustments in response to tightening privacy restrictions by platforms like Google Play Store and Apple Store. These changes reduced the availability and utility of data, potentially making their use in targeted advertising less effective for customers.

31.    AppLovin generates revenue primarily through two segments: (1) Advertising Revenue, for which the Company earns fees from advertisers for placing ads on mobile applications owned by publishers; and (2) Apps Revenue, including revenue from in-app purchases and from clients purchasing digital advertising inventory within AppLovin's portfolio of apps. The Company's mobile gaming apps are generally free to play, and AppLovin generates revenue from in-

app purchases made by users. The Company's software platforms are composed of a suite of services sold to other mobile app advertisers to purportedly grow and monetize their respective apps.

32.    In the second quarter of 2024, the Company rolled out its e-commerce pilot program, which was designed to expand the Company's advertising capabilities beyond its core gaming vertical. AppLovin's e-commerce pilot program enables commercial vendors that sell products via websites to buy video ad inventory within mobile gaming and other apps. Users are then routed to the vendors' websites to complete their purchases.

33.    AppLovin markets its AXON algorithm as a sophisticated AI-powered advertising engine designed to optimize user acquisition, ad targeting, and monetization for advertisers and publishers. AXON is a machine learning platform that purports to continuously improve its models by assessing vast amounts of data generated from AppLovin's network of over a billion daily active users. This data forms a feedback loop where ad impressions, user interactions, and conversion metrics are processed by AI to predict user behavior and identify high-value audiences.

**B.    AppLovin Corp.'s False and Misleading Statements**

34.    During the Relevant Period, AppLovin Corp. and its executive officers made materially false and misleading statements by: (1) failing to disclose that AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosing risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (3) falsely attributing AppLovin's growth in revenue to the Company's enhanced

AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games, and as a result of the foregoing, making public statements about the Company's business, operations, and prospects that were materially false and misleading.

35.    On May 9, 2023, AppLovin Corp. issued a shareholder letter in connection with the filing of its financial results for the first quarter and fiscal year ended March 31, 2023 (the "Q1 2023 Shareholder Letter"). In the Q1 2023 Shareholder Letter, AppLovin stated that "Our solid financial performance in the first quarter was driven by our market leading solutions which led to record quarterly Software Platform revenue of $355 million, an increase of 16% over the prior quarter." The Q1 2023 Shareholder Letter attributed the increase in revenue in part to improvements in its core advertising technology:

> In the first quarter, we achieved our highest quarterly Software Platform revenue at $355 million, growing 199% year-over-year (8% growth after excluding the impact of publisher bonuses in the prior year period). . The 8% increase in revenue was primarily driven by partial stabilization in the mobile app ad market and continued improvements in our core advertising technology resulting in higher revenue per install from our advertising solutions, and a modest contribution from our acquisition of Wurl.

36.    On the next day, AppLovin filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ended March 31, 2023 (the "Q1 2023 10-Q"). The Q1 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

37.    The Q1 2023 10-Q also contained the following risk factor concerning

the Company's reliance on third-party platforms:

> We rely on third-party platforms to distribute our Apps and collect revenue, and if our ability to do so is harmed, or such third-party platforms change their policies in such a way that restricts our business, increases our expenses, or limits the information we derive from our Apps, our business, financial condition, and results of operations could be adversely affected.

> The mobile app ecosystem depends in part on a relatively small number of third-party distribution platforms, such as the Apple App Store, the Google Play Store, and Facebook, some of which are direct competitors. We derive significant revenue from the distribution of our Apps through these third party platforms and almost all of our IAPs are made through the payment processing systems of these third-party platforms. We are subject to the standard policies and terms of service of such third-party platforms, which generally govern the promotion, distribution, content, and operation of applications on such platforms.

38.    This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Relevant Period.

39.    On August 9, 2023, the Company published a shareholder letter announcing the Company's financial results for the second quarter ended June 30, 2023 (the "Q2 2023 Shareholder Letter"). Specifically, the Q2 2023 Shareholder Letter stated the following, in relevant part:

> Upgrading from AXON 1 to 2 is no different than OpenAI moving from ChatGPT 3 to 4. Our models can always be improved, and our entire business is powered by the evolution of our technology. The enhancements to our machine learning and AI are not a one time thing, but a series of upgrades over time. As we make these, there is the potential for significant lifts to both revenue and cash flow. We are currently in the midst of a staged rollout of AXON 2, and we are very excited about the long-term potential of this new technology for our partners and our business.

40.    During the corresponding earnings call held that same day, Defendant Foroughi detailed the improvements made to the AXON platform and the development of AXON 2.0:

> We had a strong second quarter, exceeding the high end of our revenue, Adjusted EBITDA and margin guidance. Outperformance was driven primarily by the successful roll-out of our latest AI- based advertising engine, AXON 2.0 which powers our AppDiscovery platform. The Software Platform business achieved record revenue, increasing a solid 14% from last quarter to $406 million, and record Adjusted EBITDA, increasing 25% from last quarter to $273 million, yielding a 67% Adjusted EBITDA margin and generating over 80% of total Adjusted EBITDA. Additionally, our Apps business continued to deliver stable Adjusted EBITDA during the quarter of $61 million with a healthy 18% Adjusted EBITDA margin.

41.    On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023, on a Form 10-Q filed with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

42.    The Q2 2023 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Relevant Period.

43.    On November 8, 2023, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30, 2023 (the "Q3 2023 Shareholder Letter"). Specifically, the Q3 2023

Shareholder Letter stated the following, in relevant part:

> We are thrilled to announce another quarter of solid execution leading to very strong financial results. We exceeded the high-end of our quarterly guidance thanks to our incredible team and unwavering commitment to growing the mobile app ecosystem. Our success this quarter was primarily driven by the continued performance of AXON 2.0, the AI-based advertising engine behind our AppDiscovery platform. Total revenue for the third quarter was $864 million (+21% yr/ yr), net income was $109 million at a net margin of 13%, and Adjusted EBITDA was $419 million (+63% yr/yr) at an Adjusted EBITDA margin of 49%. During the quarter, we generated $199 million of net cash from operating activities and $194 million of Free Cash Flow. At the end of the third quarter, we had $332 million of cash and cash equivalents.

> […]

> During the quarter we benefited from the full quarter impact of our initial AXON 2.0 launch, continued improvements of our technology and an increase in advertiser spend as our clients saw the improved performance of our new AI- enhanced advertising engine. Software Platform Adjusted EBITDA grew 91% year-over-year to $364 million at an Adjusted EBITDA margin of 72%.

44.    On November 8, 2023, the Company submitted its quarterly report for the period ended September 30, 2023, on a Form 10-Q filed with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

45.    The Q3 2023 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of

service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk materialized during the Class Period.

46.    On February 14, 2024, the Company published a shareholder letter announcing the Company's financial results for the fourth quarter and full year ended December 31, 2023 (the "Q4 2024 Shareholder Letter"). Specifically, the Q4 2024 Shareholder Letter stated the following, in relevant part:

> In 2023 we released our advanced AXON 2.0 technology, optimized our gaming studios, and invested in new initiatives to drive future market expansion and long- term growth. In 4Q23 there were several key factors driving the growth of our customers and partners including a strong holiday season, year-over-year growth in the mobile app advertising market, our MAX bidding enhancements and the market shift to real-time bidding. The combination of these factors is helping the market improve advertising efficiency, which we believe will lead to continued compounding growth for our partners.

> […]

> In the fourth quarter, we achieved another record quarter with Software Platform revenue of $576 million, growing 88% year-over-year and 14% from the third quarter. The growth was driven by the continued performance of AppDiscovery, as the AXON engine continues to learn and scale.

47.    On February 26, 2024, the Company submitted its annual report for the fourth quarter and full year ended December 31, 2023, on a Form 10-K filed with the SEC (the "2023 10-K"). The 2023 10-K assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

48.    The 2023 10-K contained substantially the same risk factor

concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk materialized during the Class Period.

49.    On May 8, 2024, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended March 31, 2024 (the "Q1 2024 Shareholder Letter"). Specifically, the Q1 2024 Shareholder Letter stated the following, in relevant part:

> The first quarter marked a strong start to 2024 with outstanding business performance driven by the continued improvement of our AXON technology. We were encouraged to see improvement in the app advertising market with another quarter of year-over-year market growth and a continued shift to realtime bidding. <u>By continuing to innovate and improve our AXON technology, we remain committed to driving growth not just for our company, but for the entire ecosystem we support.</u>

> […]

> Our Software Platform segment grew significantly in the first quarter with Software Platform revenue of $678 million, up 91% year-over-year <u>driven by further improvement of our AXON technology, which continues to benefit from ongoing self-learning, additional data, and engineering enhancements.</u>

50.    On May 8, 2024, the Company submitted its quarterly report for the period ended March 31, 2024, on a Form 10-Q filed with the SEC (the "Q1 2024 10-Q"). The Q1 2024 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

51.    The Q1 2024 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

52.    On August 7, 2024, the Company published a shareholder letter announcing the Company's financial results for the second quarter ended June 30, 2024 (the "Q2 2024 Shareholder Letter"). Specifically, the Q2 2024 Shareholder Letter stated the following, in relevant part:

> In the second quarter of 2024, we celebrated the first anniversary of our enhanced AXON technology. Reflecting on the past year, <u>we're thrilled by the significant growth AXON drove for our advertising partners. AXON enhancements through ongoing self-learning and our dedicated development efforts have fueled robust business performance this quarter</u>. In the second quarter, we generated revenue of $1.08 billion (+44% yr/yr), net income of $310 million (+286% yr/yr) at a net margin of 29%, and Adjusted EBITDA of $601 million (+80% yr/yr) at an Adjusted EBITDA margin of 56%

53.    On August 7, 2024, the Company submitted its quarterly report for the period ended June 30, 2024, on a Form 10-Q filed with the SEC (the "Q2 2024 10-Q"). The Q2 2024 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

54.    The Q2 2024 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the

Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

55.    On November 6, 2024, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30, 2024 (the "Q3 2024 Shareholder Letter"). Specifically, the Q3 2024 Shareholder Letter stated the following, in relevant part:

> We had another fantastic quarter in Q3. <u>Our AXON models continue to improve through self-learning and, more importantly this quarter, from technology enhancements by our engineering team.</u> As we continue to improve our models our advertising partners are able to successfully spend at a greater scale. We're proud to be a catalyst to reinvigorating growth in our industry.

56.    On November 6, 2024, the Company submitted its quarterly report for the period ended June 30, 2024, on a Form 10-Q filed with the SEC (the "Q2 2024 10-Q"). The Q2 2024 10- Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

57.    The Q2 2024 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, supra. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

58.    On February 12, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024. During the accompanying conference call to discuss the results, Defendant Foroughi touted the use of AppLovin's AI technology to drive

revenue:

> Q4 was a major milestone, arguably our most foundational period
> since the shopping advertising dollars and witnessed the impact of an
> advertising category beyond solely gaming contributing to our
> growth.

[…]

> Seven years ago, we began acquiring gaming studios to help train our
> earliest machine learning models, an invaluable step in shaping the AI
> that underpins our AXON platform.

59. The foregoing statements were materially false and misleading. The Company: (1) failed to disclose AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosed risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (3) falsely attributed AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games.

**C.    The Truth is Revealed**

60. The truth about the legitimacy of AppLovin's business was fully revealed on March 26, 2025, when the Muddy Waters Report was published. The Muddy Waters Report concluded that AppLovin engaged in several questionable practices. The Muddy Waters Report alleged four main issues. First, the Muddy Waters Report claimed that over half of AppLovin's ecommerce ads were placed via "retargeting" of content, which suggested that the ads did not provide real

value and could violate terms of service of major platforms like Apple, Meta, and Google. Second, the Muddy Waters Report stated that 23 percent of beta test advertisers had "churned," or been lost to attrition. Third, the Muddy Waters Report alleged that AppLovin used proprietary third-party data in ways that violated the terms of service of its competitors, potentially leading to backlash and service blocking. Finally, the Muddy Waters Report alleged that AppLovin claimed that it drives incremental sales, or real users who click the ads and actually buy products, nearly 100 percent of the time, when in truth AppLovin's incrementality rate was only 25 to 35 percent.

61.    On this news, AppLovin's stock price plummeted 20 percent, dropping from $327.62 to $261.70 per share on March 27, 2025.

**D.    Defendants' Misconduct Has and Continues to Harm the Company**

62.    As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

63.    AppLovin Corp.'s reputation and goodwill have also been damaged by the Defendants' misconduct.

**E.    AppLovin Corp. Issues False and Misleading Proxy Statements**

64.    In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 25, 2023 (the "2023 Proxy"), April 23, 2023 (the "2024 Proxy"), and April 22, 2025 (the "2025 Proxy") (collectively, the "False Proxies") that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

65.     The Director Defendants drafted, approved, reviewed, and/or signed the False Proxies before they were filed with the SEC and disseminated to AppLovin Corp.'s stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the False Proxies allegations and related claims.

66.     In support of re-electing themselves, Defendants Foroughi, Morgenfeld Billings, Chen, Georgiadis, Dawson, Messing, and  Morgenfeld highlighted their supposed oversight of the Company in the False Proxies. The 2023 Proxy Proxy stated:

**Role of Board in Risk Oversight Process**

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational, in the pursuit and achievement of our strategic objectives. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and compliance, cybersecurity, and financial risks, while our Board of Directors, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed, as well as to foster a corporate culture of integrity. Consistent with this approach, our Board of Directors, directly and through its committees, regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team and/or its advisors at each of its regular Board and committee meetings. Our Board of Directors also receives regular reports on all significant committee activities at each regular Board meeting, and evaluates the risks inherent in significant transactions. As part of this approach, our Board considers both the materiality of a risk and its immediacy in making strategic decisions and helping management prioritize resources.

67.     The 2024 Proxy similarly states:

-19-

Role of Board in Risk Oversight Process Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational, in the pursuit and achievement of our strategic objectives. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and compliance, cybersecurity, and financial risks, while our Board of Directors, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed, as well as to foster a corporate culture of integrity. Consistent with this approach, our Board of Directors, directly and through its committees, regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team and/or its advisors at each of its regular Board and committee meetings. Our Board of Directors also receives regular reports on all significant committee activities at each regular Board meeting, and evaluates the risks inherent in significant transactions.

68.     Likewise the 2025 Proxy states:

**Role of our Board in the Risk Oversight Process**
**How Our Board Oversees Risk**

As our business and operations evolve, we remain focused on identifying, assessing, and mitigating risks that could impact our current and future business as they emerge. While our management team handles the day-to-day oversight of strategic, financial, operational, reputational and legal risks, our Board of Directors and its independent committees play a critical role providing high-level oversight of those risks and ensuring the Company maintains a risk management framework that fosters accountability and is responsive to the Company's evolving operations.

69.     The False Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements. The Company (1) failed to disclose AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including

click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclose risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (3) falsely attributed AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games.

70.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

## F.    The Board Breached its Fiduciary Duties

71.    As officers and/or directors of AppLovin Corp., the Defendants owed AppLovin Corp. fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage AppLovin Corp. in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of AppLovin Corp., the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

72.    Defendants, because of their positions of control and authority as directors and/or officers of AppLovin Corp., were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding AppLovin Corp.'s financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon

truthful and accurate information.

73.    To discharge their duties, the officers and directors of AppLovin Corp. were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and AppLovin Corp. were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws,

rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

74.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

75.    The Board's Audit Committee is tasked with overseeing AppLovin Corp.'s financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of AppLovin Corp.'s internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

> Risk Assessment and Risk Management. The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to: financial, accounting and tax; technology, including AI, and information security, including cybersecurity; and data privacy and protection matters. The Committee will also review the Company's risk management framework and programs to address risks, including a review of the Company's network security program and controls with the Company's Head of Information Security and Compliance and evaluate the adequacy of the Company's data privacy compliance program with the Chief Legal Officer or Head of Privacy, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

76.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Billings, Georgiadis, Dawson, and Morgenfeld (the "Audit Defendants") conducted little, if any, oversight of the

Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

77.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

78.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on AppLovin Corp.

## DERIVATIVE ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of AppLovin Corp. to redress injuries suffered by AppLovin Corp. as a direct result of the Director Defendants' breaches of fiduciary duty.  AppLovin Corp. is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80.    Plaintiff will adequately and fairly represent the interests of AppLovin Corp. in enforcing and prosecuting the Company's rights.

81.    Plaintiff was a stockholder of AppLovin Corp. at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently an AppLovin Corp. stockholder.

## DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

83.    The AppLovin Corp. Board currently has nine members: Foroughi, Billings, Chen, Georgiadis, Dawson, Messing, Morgenfeld, Oberwager, and Vivas.

84.    Plaintiff has not made any demand on AppLovin Corp.'s current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A.    The Director Defendants Lack Independence Because They Face a Substantial Likelihood of Liability

85.    As alleged above, Defendants Foroughi, Billings, Chen, Georgiadis, Dawson, Messing, Morgenfeld, Oberwager, and Vivas breached their fiduciary duties by negligently issuing the materially false and misleading Proxies soliciting the reelection of themselves to the Board. Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the False Proxies and any demand upon these defendants is therefore futile.

86.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. As alleged above, Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

87.    In addition, Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of AppLovin Corp..

88.    Director Defendants making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in Director Defendants facing a substantial likelihood of liability. If Director Defendants were to bring a suit on behalf of AppLovin Corp. to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to Director Defendants.

B.    **The Officer Defendant are not Independent**

89.    Defendant Foroughi is one of the Company's co-founders and serves as the Company's Chief Executive Officer. Defendant Foroughi received compensation of $83,361,678 in 2023 and $11,202,098 in 2024. Defendant Foroughi depends on AppLovin Corp. for his income. In addition, AppLovin Corp. stated in the False Proxies filed with the SEC that Defendant Foroughi is not independent pursuant to SEC and NYSE rules.

90.    Defendant Stumpf is the Chief Financial Officer of the Company. Defendant Stumpf received compensation of $7,398,421 in 2024. Stumpf depends on AppLovin Corp. for his income. In addition, AppLovin Corp. stated in the False Proxies filed with the SEC that Defendant Stumpf is not independent pursuant to SEC and NYSE rules.

C.    **The Audit Defendants are not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting**

91.    One of the Audit Committee's responsibilities is risk assessment and management. The Audit Committee was thus responsible for reviewing and approving AppLovin Corp.'s Forms 10-Q and 10-K filed between 2023, 2024, and 2025. The Audit Defendants Billings, Georgiadis, Dawson, and Morganfeld were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, the Audit Defendants caused improper statements by the Company. Accordingly, Defendants breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

92.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

93.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94.    Each of the Defendants owed and owes AppLovin Corp. the highest obligations of loyalty, good faith, due care, and oversight.

95.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

96.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

97.    In addition, the Director Defendants further breached their fiduciary duties owed to AppLovin Corp. by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose as follows: (1) failing to disclose that AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosing risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; (3) falsely attributing AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games; and (4) as a result of the foregoing, making public statements about the Company's business, operations, and prospects that were materially false and misleading.

98.    The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

99.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

100.    As a direct and proximate result of the breaches of duty alleged herein, AppLovin Corp. has sustained and will sustain significant damages.

101.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

102.    Plaintiff, on behalf of AppLovin Corp., has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty
## (Derivatively Against the Officer Defendants)

103.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104.    The Officer Defendants are executive officers of the Company. As

executive officers, The Officer Defendants owed and owe AppLovin Corp. the highest obligations of loyalty, good faith, due care, oversight, and candor.

105.    The Officer Defendants breached their fiduciary duties owed to AppLovin Corp. by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, namely: (1) failing to disclose that AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosing risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; (3) falsely attributing AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games; and (4) as a result of the foregoing, making public statements about the Company's business, operations, and prospects that were materially false and misleading. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

106.    As a direct and proximate result of the breaches of duty alleged herein, AppLovin Corp. has sustained and will sustain significant damages.

107.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

108.    Plaintiff, on behalf of AppLovin Corp., has no adequate remedy at law.

<u>**COUNT III**</u>
<u>**Violation of Section 14(a) of the Exchange Act**</u>
<u>**(Against The Director Defendants)**</u>

109.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

110.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

111.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the False Proxies. In the False Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

112.   The False Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, AppLovin Corp. misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

113.   Plaintiff, on behalf of AppLovin Corp., thereby seeks relief for damages inflicted upon the Company based upon the misleading False Proxies in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of AppLovin Corp. and that Plaintiff is a proper and adequate representative

PLAINTIFF'S DERIVATIVE COMPLAINT

of the Company;

B.        Against all of the Defendants and in favor of AppLovin Corp. for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.        Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.        Awarding AppLovin Corp. restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.        Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.        Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 19, 2025      By:   /s/ Francis J. "Casey" Flynn, Jr.

Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ROWLEY LAW PLLC**
Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
50 Main Street, Suite 1000

-32-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

White Plains, New York 10606
Phone: (914) 400-1920
Email: srowley@rowleylawpllc.com
     drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**